356

ENOS FRENCH AND THE HOME INDEMNITY COMPANY, A CORPORATION, PLAINTIFFS AND APPELLANTS, v. RAY ABERCROMBIE, D/B/A ABERCROMBIE CONSTRUCTION COMPANY, AND JERRY ABERCROMBIE, DEFENDANTS AND RESPONDENTS.

No. 11714.
Submitted Nov. 19, 1970.
Decided Feb. 2, 1971.
480 P.2d 187.

Mr. Justice Haswell did not participate.

Bjella & Jestrab, Frank Jestrab (argued), John R. Gordon, Williston, N. D., Kelly & Carr, Miles City, Jardine, Stephenson, Blewett & Weaver, Great Falls, for plaintiffs-appellants.

Poore, McKenzie, Roth & Robischon, Robert A. Poore (argued), Butte, Aronow & Anderson, Shelby, for defendants and respondents.

MR. JUSTICE CASTLES delivered the opinion of the court.

The plaintiff, Enos G. French, brought this action in the district court to recover damages suffered through the alleged negligence of the defendants in constructing a trench. Jury trial was had in Cut Bank, Montana, before the Hon. Philip C. Duncan, judge of the fifth judicial district, presiding. The jury returned a verdict for the defendants. Thereafter, plaintiffs moved for a judgment notwithstanding the verdict or for a new trial upon the ground that the trial court erred in giving certain instructions concerning the duties owed by defendants to plaintiff French and for refusing plaintiff's offer of proof of certain safety standards issued by the Montana Industrial Accident Board. The court denied, by order, both of plaintiffs' motions. Plaintiffs now appeal from the judgment entered upon the verdict.

Plaintiff French was injured in an industrial accident. He received workmen's compensation benefits from his employer, National Tank Company. Then he, and National Tank Company's industrial accident insurance carrier, Home Indemnity Company, brought this action against defendants Ray Aber-

crombie, doing business as Abercrombie Construction, and Jerry Abercrombie, collectively hereinafter referred to as "Abercrombie". Plaintiffs allege Abercrombie's negligence was the cause of French's injury.

The trial in this case extended over a two week period and the record is voluminous. We shall confine the fact statement to only that necessary to determine the issues.

The issues as stated by appellants are:

1. "Where a possessor of land has engaged two independent contractors to concurrently perform work upon his land, whether the status of an employee of one contractor relative to the other contractor is commensurate with the status of that employee to the possessor of the land."

2. "Whether the trial court erred in refusing admission into evidence of the 'Minimum Safety Standards for the Construction Industry in Montana', Chapter IV, promulgated by the Industrial Accident Board, for evidence of the dangerous character of the trench, and of the Defendant's failure to properly protect the trench."

However, as to the first question, it will appear from the facts recited hereinafter that the contractors were not working "concurrently". As a matter of fact the jury could find from the evidence that the plaintiff French went down into the trench without the knowledge or consent of the defendants and the trench was not at all complete nor ready. More will be said about this later in this opinion. The facts are:

On January 27, 1965, at approximately 5:00 p. m., the plaintiff Enos French and his co-worker, Virgil Laasch, were attempting to install strings of four inch diameter pipe on the bottom of a seven foot deep trench, located on a Humble Oil & Refining Company lease site in the Red Creek Field, which is situated in Glacier County, approximately 25 miles north of Cut Bank, Montana. The day was cold, the wind was calm. Suddenly, without warning, a large frozen portion of the trench wall collapsed and fell upon French, pinning his head to the opposite wall of

the trench. French brought this action to recover damages for the permanent injuries received as a result of this accident.

Humble Oil & Refining Company, not a party to this action, held several oil and gas leases within the Red Creek Field. During the latter months of 1964, Humble had embarked on an extensive program to consolidate the flow lines from their various wells in the area and set up a water treatment and pumping system. Humble entered into a contract with Abercrombie to dig the necessary ditches, install approximately 92,000 feet of 3 to 4 inch diameter pipe and connect all of the pipes to a central manifold. This work was to be done by Abercrombie under what was known as a "bid contract".

Abercrombie started work under this "bid contract" some time in October 1964, and was still doing at least some work under it at the time of the accident.

Late in 1964, National Tank Company sold to Humble some crude oil storage tanks and treaters to be used on this same location. Under the sales agreement, National Tank was responsible for installation, with the exception that Humble would provide for excavation of the trenches necessary for the connecting pipelines. Clifford Johnson, the regional manager and salesman for National Tank, was told by Mr. Fred White of Humble, to contact Abercrombie to do the trenching work.

Abercrombie had a separate and additional contract with Humble, known as a "master field contract". This contract had no relation or connection with the aforementioned "bid contract". This "master field contract" was entered into between Abercrombie and Humble on March 15, 1961 and established a contractual arrangement whereby Humble would hire Abercrombie for specific jobs upon an "on-call" basis. This contractual arrangement is a common oil field practice, which permits the contractee to request performance of certain small-lot jobs without submitting them for bid among the various oil field contractors. Upon request Abercrombie would perform

the work under this contract and invoice Humble upon its completion by charging them for the number of hours involved, upon an agreed rate schedule.

French was an employee of National Tank. He was a member of a three man crew. Clifford Johnson was pusher or foreman. Virgil Laasch was the third member. This crew had been working in the area of the accident for two months, setting the treaters on their pads and making surface connections. During the same period of time, Abercrombie's crew had been digging its own trenches, in a spoke fashion radiating from the accident area, under its "bid contract".

On or before January 19, 1965, after being instructed to do so by Humble, Clifford Johnson of National Tank talked to Jerry Abercrombie at the job-site, and told him that they needed a trench in which to lay some connecting pipelines. Abercrombie agreed to dig the ditch on behalf of Humble under the "master field contract." Jerry Abercrombie was the foreman of the Abercrombie Construction Company crew at the accident site. He was instructed by Johnson to dig a ditch, in an east-west direction, from the treaters located on the east, to the free water knock-out vessel on the west, a distance of approximately 100 feet. This ditch was to be 6 to 7 feet deep.

On January 19, the Abercrombie crew, using a rotary ditching machine, dug a trench 24 inches wide from the treater to the east to the free water knock-out on the west. On Monday, January 25, Jerry Abercrombie was informed by Clifford Johnson that the ditch was in the wrong place and was not wide enough for the National Tank crew to get into, in order to connect and install its pipe.

Either that same day January 25, or the next January 26, Jerry Abercrombie instructed his back-hoe operator to start at the east end of the first trench, and attempt to widen it by scaling off the southern wall. At this time the frost level in the ground had reached a depth of about 4 feet and after several attempts were thwarted by the frozen ground, the back-hoe operator stopped. The next day Jerry Abercrombie used an 11 ton

"Cat" bulldozer to push the spoil piled on the north side of the ditch back into the trench. Then the rotary ditching machine was placed at the east end of the first ditch and started a second parallel trench about 6 to 8 inches south of the first ditch. The spoil from this second ditch was again placed on the north side of the first ditch. After the second trench was excavated the entire 100 foot length parallel to the first ditch, Jerry Abercrombie again used the 11 ton "Cat" bulldozer to push the spoil from the north side back into the second ditch. This process was completed early in the afternoon of January 27, the date of the accident.

At this time, the Abercrombie back-hoe operator placed his machine over both ditches at their eastern-most end. He proceeded to remove the dirt from the north, or first trench, and then the dirt from the second or south trench, and finally pulled out the center portion between the two, leaving an excavation approximately 54 to 60 inches wide and 6½ to 7 feet deep. This procedure was repeated in a westerly direction along the two trenches for approximately 11 or 12 feet from the east end. The back-hoe operator then discovered that the center section had become so wide, and was so frozen that he was unable to dislodge the dirt. After several attempts to remove this center portion, the back-hoe operator continued to remove the spoil from the southern, or second ditch, moving in a westerly direction until he was able to find a portion of the middle section that was susceptible of being dislodged. He then again removed the spoil from both the north and south ditches and excavated the middle portion for a distance of about 3 or 4 feet west of the troublesome center section. When the back-hoe operator reached this position, it was approximately 4:30 p.m. on the afternoon of January 27, and Jerry Abercrombie called an end to his employees' workday.

At quitting time for the Abercrombie crew, the trench had developed the following appearance: proceeding from the east end for a distance of about 11 to 12 feet was a trench about 54 to 60 inches wide and 6½ to 7 feet deep. The trench then sharply

narrowed into a smaller south ditch about 24 inches wide, continuing for 10 to 12 feet westerly, where it again widened to 54 to 60 inches for a distance of 3 to 4 feet west to the resting place of the back-hoe. On the north side of the narrow portion of the ditch was another ditch that had been refilled with spoil and not yet reexcavated. Left in the middle was the frozen pillar, unattached to either wall of the trench, 11-12 feet long, 7 feet high and 8-12 inches thick.

At this point there is a conflict in the evidence. Laasch testified French said to Jerry Abercrombie in Laasch's presence, "We're going to get down in the ditch and lay pipe as far as you have got it dug", to which Abercrombie replied "All right." Jerry Abercrombie denied making any such statement or having any knowledge that the National Tank crew would be in the ditch. Jerry Abercrombie testified that he did not consider the ditch finished. It should be noted that the Abercrombie equipment was left in position to resume work and Laasch acknowledged this.

French testified at the trial that as a result of his injuries he did not remember any of the events of the day of the accident. The trial was in March, 1969. On cross-examination, counsel read into the record the deposition taken of French in May, 1966. At that time French remembered Jerry Abercrombie left the job about 4:30 p.m. and this testimony appeared:

"Q. Would you state whether or not you or Virgil Laasch or any other employee of National Tank Company advised Jerry Abercrombie or any other employee of Abercrombie Construction Company that you intended to go into the trench and lay pipe on the evening of January 27, 1965? A. No sir, I didn't. It was too early to come in so we had to work a little more.

"Q. You knew, did you not, that Jerry Abercrombie or other employees of Abercrombie Construction Company were going to have to come back the next day to complete the ditch? Isn't that right? A. Yes, sir."

The evidence is clear that the ditch was not complete on January 27, 1965, having but four feet dug next to the bell hole to

its full width, 10 feet of the original ditch (where the accident occurred) open, and 4 more feet to its full width, leaving over 80 feet of the ditch unexcavated.

At any rate, shortly after the Abercrombie crew left the worksite, French and Laasch went into the ditch with a pick and shovel. According to Laasch, they were smoothing the bottom of the ditch in order to lay pipe. The frozen pillar broke off, pinning French's head against the south wall. Laasch was not hurt and he suceeded in freeing French and getting him medical help. Laasch testified nothing had been done to "undermine" the pillar. Other witnesses who examined the area the next day, testified Laasch told them that he and French had been digging along the base of the pillar. These witnesses testified as to marks showing the pillar had been undercut.

Plaintiffs' complaint alleged a claim of negligence; a claim of breach of express and implied warranties; and a claim based upon French's status as a third party beneficiary of the "master field contract" between Humble and Abercrombie.

At the completion of the case-in-chief, defendants offered their proposed instructions numbered 12, 13, 14 and 15, each of which was objected to by plaintiffs. They were, however, received and given over objection. Defendants' instruction No. 12 was given as Court's No. 13; defendants' No. 13 was given as Court's No. 15; defendants' No. 14 was given as Court's No. 17; and defendants' No. 15 was given as Court's No. 18.

The jury returned a verdict for the defendants and the court entered judgment thereon on March 12, 1969. Thereafter, on March 20, 1969, plaintiffs made a motion for judgment notwithstanding the verdict or for a new trial, pursuant to Rules 50(b) and 59, M.R.Civ.P., which was denied by the court on April 18, 1969.

During trial plaintiffs offered in evidence plaintiff's Exhibit 56, a pamphlet entitled "Minimum Safety Standards for the Construction Industry in Montana, 1964, Industrial Accident Board, Department of Safety, Helena, Montana, Chapter 4."

Defendants' objection to Exhibit 56 was sustained, and the court refused plaintiffs' offer of proof to establish the following facts:

(1) That the trench in which the plaintiff French was injured was a dangerous trench;

(2) That the trench in which the plaintiff French was injured was not properly protected by shoring or casting as required by the regulations of the Industrial Accident Board promulgated pursuant to the power delegated to it by the legislature of the state of Montana; and

(3) That the defendants knowingly omitted to take the required precautions.

Defendant Ray Abercrombie testified that he has used shoring in utilities construction, but rarely in pipeline construction.

As we have shown heretofore, the evidence is wholly contrary to plaintiffs' claim of contemporaneous and concurrent work on or in the ditch. National Tank had no rights or duties as to the ditch until Abercrombie completed it and turned it over. Abercrombie was an independent contractor.

Essentially the court's instructions numbered 13, 15, 17 and 18 were as follows:

No. 13. Abercrombie was an independent contractor of Humble to dig a ditch, and until the ditch was dug and completed Abercrombie occupied the legal position of possessor or owner of the land, enjoying the same liabilities and immunities as though it were the true owner.

No. 15. When French came onto the ditch area, he was either a licensee or business invitee of Abercrombie, and plaintiffs must prove by a preponderance of the evidence that he was an invitee of Abercrombie when he went into the trench.

No. 17. In order for French to be a business invitee of Abercrombie, it must be shown by a preponderance of the evidence that he was expressly or impliedly invited upon the ditch by Abercrombie, and that his presence there was to the common interest or mutual advantage of French and Abercrombie.

No. 18. Unless it is established by a preponderance of the evidence that French was an invitee of Abercrombie, he is then a mere licensee.

Plaintiffs contend the instructions are erroneous because they ignore French's status as a business invitee of Humble at the ditch; that Abercrombie and National Tank were required to work "concurrently" in the ditch; and thus, Abercrombie did not have "exclusive control" of the ditch. However, as pointed out heretofore, the evidence is that until the ditch was dug and completed, National Tank simply had no business in the ditch. But, under the instructions, since there was some conflict in the testimony, the court allowed the jury to determine the status of French and thereafter the duty owned by Abercrombie.

Plaintiffs cite cases where workmen, such as carpenters and electricians, are required to work side by side; and each is a business invitee of the other's employer. However, again we point out that such were not the facts here. Until the ditch was completed, National Tank could not lay its pipe; until the pipe was laid, Abercrombie could not backfill. This was the evidence persented.

Instruction No. 13 specifies that Abercrombie was the possessor of the lands until the ditch was completed. This instruction, under the facts here, accords with 2 Restatement of Torts 2d, § 384.

■ ■ It follows that as temporary possessor the lands, anybody who came in that area while Abercrombie's work was still in progress, that is before the ditch was completed, had the burden of proving his legal status on the premises. See Hickman v. First Nat. Bk. of Great Falls, 112 Mont. 398, 410, 117 P.2d 275; Ahlquist v. Mulvaney Realty Co., 116 Mont. 6, 152 P.2d 137; Chichas v. Foley Bros. Grocery Co., 73 Mont. 575, 236 P. 361; Blackman v. Crowe, 149 Mont. 253, 425 P.2d 323. For a discussion of leaving to the jury the status of a plaintiff on the premises where there is a conflict of evidence, see Seder v. Peter

Kiewit Sons' Co., 156 Mont. 322, 479 P.2d 448, 28 St.Rep. 28. In Instruction No. 17 this burden was made clear and left to the jury.

We find no error in the instructions complained of.

As to the second issue, the question of the admissibility into evidence of the Industrial Accident Board's safety standards pamphlet, the facts are these: On February 10, 1969, defense counsel were first apprised that plaintiffs intended to prove the alleged applicability of the pamphlet at trial. Thereupon defendants moved for a pretrial conference. On the first day of trial, such a conference was had. Defendants argued that the pamphlet was not legally relevant, that the motion to amend was not timely, and that defendants could show that the Industrial Accident Board did not endeavor to apply the rules in the Cut Bank area where the soil is stable gumbo. The trial judge ruled against the pamphlet as admissable evidence.

During the course of the trial plaintiffs, by an offer of proof, attempted to introduce the pamphlet. It is the plaintiffs' argument that the minimum safety standards contained in the pamphlet were admissible to prove the breach of the duty owed by one independent contractor to an employee of another independent contractor.

Again, the evidence demonstrated that the ditch was perhaps 10% excavated. It was not completed. No portion was ready to receive pipe. The Abercrombie equipment was left right at the job-site for work the following morning in removing the pillar and continuing the ditch excavation. The ditch simply was not ready, even for shoring if it were required. As to this, plaintiffs' own expert witness testified that he would not have shored the ditch.

The Industrial Accident Board pamphlet was never intended to augment the duties of a contractor as to third persons. Until the ditch was complete and turned over to Humble, Abercrombie was entitled to possession and French had no more rights than any other third person. Sound ditch construction does not require a contractor to shore the very thing he is

trying to collapse and remove. See Hackley v. Waldorf-Hoerner Paper Co., 149 Mont. 286, 293, 294, 425 P.2d 712; Wells v. Thill, 153 Mont. 28, 452 P.2d 1015; Baird v. Chokatos, 473 Mont. 547, 473 P.2d 547, 27 St.Rep. 629.

We find no error. Plaintiffs had their rights against Abercrombie (as a third party who was *not* French's employer) fully and fairly considered by the jury. The jury rejected plaintiffs' claims that Abercrombie breached some duty it owed to French.

The judgment is affirmed.

MR. CHIEF JUSTICE JAMES T. HARRISON and MR. JUSTICES JOHN C. HARRISON and DALY concur.